# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **MAURICE BOSTON,** ) | |
| ) | **No. 14 CV 8680** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **THOMAS DART and MARLENE** ) | |
| **FUENTES,** ) | |
| ) | **September 26, 2016** |
| **Defendants.** ) | |

## MEMORANDUM OPINION and ORDER

Maurice Boston, a former pretrial detainee at the Cook County Jail[1] ("CCJ"), brings this action *pro se* pursuant to the Civil Rights Act, 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 791, *et seq.* Boston, who is wheelchair-bound, claims that Cook County Sheriff Thomas Dart and former CCJ ADA Coordinator Marlene Fuentes violated his rights by acting with deliberate indifference to his serious medical needs and by refusing to accommodate his disability. The parties have consented to this court's jurisdiction, (R. 29); *see* 28 U.S.C. § 636(c), and before the court is Defendants' motion for summary judgment. For the following reasons, the motion is granted.

## Northern District of Illinois Local Rule 56.1

Before describing the facts the parties submitted in connection with the current motion, the court notes that in several respects Boston's submissions fall

---

[1] Boston is currently an inmate at an Illinois Department of Corrections facility.

short of the requirements set out in Local Rule 56.1. "Under the Local Rules of the Northern District of Illinois, a party filing a motion for summary judgment under Fed. R. Civ. P. 56 must serve and file a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (internal quotation and citation omitted). The opposing party must then "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). A plaintiff's *pro se* status does not excuse him from complying with these rules. *Morrow v. Donahoe*, 564 Fed. Appx. 859, 860 (7th Cir. 2014).

In this case, in compliance with the Local Rules, Defendants filed a statement of material facts along with their motion for summary judgment. (R. 64, Defs.' Stmt. of Facts ("DSOF").) Each substantive assertion of fact in the DSOF is supported by evidentiary material in the record. Also, Defendants provided Boston with the required Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. (R. 65.) However, Boston's response to the DSOF and his

submission titled "Plaintiff's Additional Material Facts" suffer from multiple deficiencies. Most significantly, some of Boston's factual assertions are unsupported by citations to the record or blend facts with legal arguments.

The Local Rules require the parties to provide "specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(a)(3). The court is not required to comb the record to locate relevant information. *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Moreover, legal arguments, suppositions, and conclusions of law are not "facts." *See Judson Atkinson*, 529 F.3d at 382 n.2 ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."). Nor is the "response to a statement of facts . . . the place for purely argumentative denials, and courts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'" *Almy v. Kickert Sch. Bus Line, Inc.*, No. 08 CV 2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) (internal citation omitted) (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000)). Accordingly, to the extent Boston has not supported his factual assertions with citations to evidence or has made legal assertions dressed up as factual statements, those assertions will not be considered.

The other significant shortcoming in Boston's factual assertions in response to the motion for summary judgment is that many of those assertions conflict with his sworn deposition testimony or involve matters requiring specialized expertise.

"[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) (internal quotation and citation omitted). Nor may a plaintiff "use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Grp. Int'l, Inc.,* 766 F.3d 735, 741 (7th Cir. 2014) (citations omitted). Moreover, a layperson may not testify about matters involving medical, technical, or other specialized knowledge.[2] *See* Fed. R. Evid. 701, 702. Thus, the court has taken into account Boston's basic representations about his general health status, such as that he is paraplegic, but has set aside those statements that call for medical expertise. And because Boston has not explained the discrepancies between some of his factual assertions and his sworn deposition testimony, the court has also excluded from consideration those conflicting assertions. With these exclusions taken into account, the relevant facts are set forth below.

---

[2] The court is mindful that the Seventh Circuit encourages trial courts in the usual course to recruit counsel in *pro se* medical cases. *See, e.g., Henderson v. Ghosh*, 755 F.3d 559, 564-67 (7th Cir. 2014); *Junior v. Anderson*, 724 F.3d 812, 815-16 (7th Cir. 2013); *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010). However, in this case the court notes that: (1) Boston never filed a renewed motion for attorney representation after the assigned district judge denied his first request in November 2014 prior to the parties' consent to this court's jurisdiction; (2) Boston is a relatively experienced litigator, having filed some six lawsuits in this district alone since 2013; (3) despite being invited to do so, Boston failed to show either that he made reasonable efforts to retain private counsel or that he was effectively precluded from making such efforts; and (4) this case is relatively straightforward, involving a dispute over basic disability accommodations rather than a dispute that requires assessment of appropriate medical care.

## Facts

The parties generally agree on the essential facts. In 1995, about 17 years prior to Boston's detention at CCJ, he was shot by a Chicago police officer. (R. 64, DSOF, Ex. 1, Boston Dep. at 15.) The incident left Boston a T11 paraplegic. (Id. at 15-16, 28.) Boston has partial movement in his right leg, but he cannot move his left. (Id. at 16.) He can walk about half a block with the assistance of a walker, cane, or leg brace, but he is unable to stand without the assistance of a brace for his left leg. (Id. at 16-17.) Nonetheless, Boston is in his wheelchair all day and he uses a seat cushion. (Id. at 44, 50.) Boston's leg paralysis has not affected his upper body strength or mobility.[3] (Id. at 17, 38.)

Defendant Fuentes's ADA Coordinator position was specifically created to address disability and accommodation issues detainees may encounter at CCJ. (R. 64, DSOF, Ex. 2, Fuentes Decl. ¶ 1.) Among her other duties, Fuentes provided annual in-service training and education to the correctional staff, as well as six to seven trainings per month on aiding detainees with mobility and other issues. (Id. ¶ 3.) Michael Gumm is the ADA Compliance Project Director for Cook County and has held this position since June 2014. (R. 64, Defs.' Ex. 4, Gumm Decl. ¶ 1.)[4] Gumm has a degree and work experience in architecture. (Id.) Gumm's job duties

---

[3] As discussed, Boston may not now recant his deposition testimony and claim that he lacks upper body strength.

[4] Boston objects to Defendants' reliance on Gumm's testimony on the ground that Defendants failed to disclose Gumm as an expert. The court overrules this objection because Defendants identified Gumm as a potential fact witness in their September 2015 Rule 26(a)(1) disclosures, (R. 89, Defs.' Reply, Ex. 6 at 1).

include: (1) development of ADA program policies, procedures, and guidelines for Cook County; (2) coordination with the Cook County Sheriff to help ensure CCJ's compliance with the ADA and Rehab Act; and (3) review of annual capital improvement projects. (Id. ¶ 2.)

CCJ's Residential Treatment Unit ("RTU") was designed and built to house detainees with disabilities and to provide them with medical treatment in a "modern, ADA-compliant facility." (Fuentes Decl. ¶ 5; Gumm Decl. ¶ 3.) This $85 million construction project began in 2009. (Fuentes Decl. ¶ 5; Gumm Decl. ¶ 3.) CCJ began transferring those detainees with special needs to the RTU in August 2014. (Fuentes Decl. ¶ 5.) Boston, who was a pretrial detainee at CCJ from July 2012 until about April 2016, was part of the first group of detainees who transferred into the RTU on August 21, 2014. (Boston Dep. at 18; R. 76, Boston Aff. at 92.) Boston raises two claims against Defendants. He claims that structural barriers in the RTU shower stalls made it exceedingly difficult for him to access the showers and that the tables in the RTU were not wheelchair-accessible. (Boston Dep. at 22, 52.)

## A.    Shower Stall

There is a shower stall in the RTU bathroom that is designed for detainees in wheelchairs. (Fuentes Decl. ¶ 7.) The stall has a concrete bench that detainees can sit on while showering. (Id.; R. 64, DSOF, Ex. 2, Attach. 4, Photos of ADA Shower

Stall.)  The shower bench is 18 inches high.[5]  (Gumm Decl. ¶ 7.)  The ADA requires shower benches to be between 17 and 18 inches high, but does not require them to be padded.  (Id. ¶¶ 8, 9.)  The surface of the shower bench is textured so that the users do not slip off.  (Id. ¶ 18.)  The shower stall with the bench is also equipped with grab bars.  (Boston Dep. at 24; Fuentes Decl. ¶ 8; Gumm Decl. ¶¶ 7-8.)  According to Gumm, this shower stall is ADA-compliant.[6]  (Fuentes Decl. ¶ 8; Gumm Decl. ¶¶ 7-8.)  The other shower stalls in the RTU, which are not designed for detainees with disabilities, are not equipped with grab bars.  (Boston Dep. at 42; Boston Aff. ¶ 5.)

Boston says that the ADA-compliant shower stall was "not of use" to him, (R. 76, Boston's Resp. to DSOF ¶ 16), because he found it very difficult to maneuver from his wheelchair onto the bench, (Boston Dep. at 24).  The shower bench, which is apparently fixed to the floor, cannot be moved.  (Id.)  Boston used the grab bars to help him move onto the concrete block, but believed that pulling himself from the chair caused stress to his injured spinal cord.  (Id. at 24-25, 30.)  He asserts that he sustained abrasions and scrapes from using the bench and that it was slippery when wet despite its textured surface.  (Id. at 44, 47; Boston Aff. at 87.)

[5]  Boston disputes this fact but expressly concedes that "he does not have personal knowledge" about the height of the bench.  (R. 76, Boston's Resp. to DSOF ¶ 16.)  Boston cannot, however, challenge DSOF without some evidentiary basis for calling into question the accuracy of the assertion, which Defendants support with sworn testimony from an individual with the particular knowledge.

[6]  Again, Boston provides no basis for refuting DSOF other than his opinion that the stall did not meet his personal needs.

On occasion during his detention at CCJ, Boston had to undergo a course of antibiotic treatment for bed sores. (Boston Dep. at 48.) Boston asserts that his pressure sores are not caused by his confinement to a wheelchair because, according to him, his $300 seat cushion and his air mattress prevent bed sores. (Id. at 45, 50-51.) He believes that the cuts and scrapes he sustained while using the concrete block in the shower stall turned into pressure sores. (Id. at 47.) However, no medical professional has diagnosed Boston as having developed pressure sores or any other medical condition as a result of him having used the concrete block. (Id. at 48.)

While conceding that he could "clean [him]self and do whatever [he] need[ed] to do" in the ADA stall, Boston states that he was nevertheless effectively unable to shower as often as he liked, and to therefore maintain proper "lower [body] hygiene," since he found it too painful both to slide over to the concrete block and to sit on it. (Id. at 25-26.) Because Boston disliked the ADA-compliant shower stall, he used the shower bench only about four or five times and spent only about six to seven minutes at a time in the shower. (Id. at 45-46.) Although Boston used the ADA shower stall on occasion, more often than not it was easier for him just to take "bird baths," washing himself at a basin using a pail. (Id. at 26, 45; Boston Aff. at 93.)

On an unspecified date, Boston complained to Fuentes that the shower bench was uncomfortable. (Fuentes Decl. ¶ 7; Boston Dep. at 26.) Fuentes told Boston

that she was working on getting a shower cushion or pad for him, but that he would have to use the ADA-compliant shower stall in the meantime. (Fuentes Decl. ¶ 8.) Fuentes searched for a commercially available shower cushion and made efforts to make Boston's showers more comfortable. (Id. ¶ 9; Boston Dep. at 46.)

In October 2014, Fuentes furnished Boston with a shower chair for his use in the non-ADA compliant shower stalls as an alternative to using the concrete bench in the ADA-compliant shower stall. (Boston Dep. at 38, 41; Fuentes Decl. ¶ 8.) But Boston asserts that he had little success using the shower chair in the non-ADA shower stalls because those stalls were not equipped with grab bars. (Boston Dep. at 42.) Fuentes provided Boston with a cushion to make showering in the ADA-compliant shower stall more comfortable. (Fuentes Decl. ¶¶ 9-10.) However, Boston rejected the cushion, complaining to Fuentes that it was too high and interfered with his ability to transfer from his wheelchair to the shower bench. (Id. ¶ 10.) Fuentes then found a mat with padding that Boston could sit on during his showers if he wished. (Fuentes Decl. ¶ 11.) Boston received his two mats on March 6, 2015, seven months after he entered the RTU. (Boston Dep. at 25, 39; R. 64, DSOF, Ex. 3, Shower Cushion Agreement.) Boston asserts that the two cushions did not provide enough protection from the hard, rough surface of the concrete bench to prevent pain and scrapes. (Boston Dep. at 25, 46.)

**B.     Table**

The tables in the RTU are designed so that detainees can glide their wheelchairs up to the circular seats at the tables and either pull their wheelchairs over the seats or slide off of their wheelchairs onto the seats.  (R. 64, DSOF, Ex. 5, Sept. 5, 2014 RTU Security Footage; Boston Dep. at 56-57; Gumm Decl. ¶ 5.)  The ADA requires seats to be between 17 and 19 inches high and the seats in the RTU are 18 inches high.  (Gumm Decl. ¶¶ 4-5.)  Detainees dine as well as engage in leisure activities at the tables.  (Boston Dep. at 52, 71-72.)

Boston claims that his physical limitations prevented him from pulling his wheelchair up over the stools even though other inmates were able to do so.  (Id. at 54-55, 57-59.)  Boston was accustomed to the tables in Division VIII, some of which had open spaces instead of stools so that detainees in wheelchairs are able to roll up to the table in their wheelchairs instead of having to move onto a seat.  (Id. at 52-53.)  In his opposition to the motion for summary judgment, Boston clarifies that he is suing over the height of the tables and not the height of the seats.  Boston claims that he feared having his legs under the table because his muscle spasms sometimes caused his legs to hit or bump against the bottom of the tables.  (Id. at 53.)  As a result, Boston further claims that he ate most of his meals in his bed and that the table design prevented him from playing cards and chess.  (Id. at 53, 71-72.)  On the security camera footage, however, Boston can be observed casually sitting at the end of a table while watching television, eating a sandwich, drinking a

soda, and talking with fellow detainees.  (R. 64, DSOF, Ex. 5, Sept. 5, 2014 RTU Security Footage; Boston Dep. at 61-62.)  Boston does not appear to be experiencing any problem using the table.  (Boston Dep. at 64.)  Boston is also able to clear his trash from the table, without any apparent struggle or strain.  (Id. at 64, 70.) Fuentes has observed Boston sitting at the end of the tables in the same manner as other detainees housed in the RTU.  (Fuentes Decl. ¶ 13.)

While conceding that the security footage depicts otherwise, Boston nevertheless maintains that he experienced difficulty eating and drinking at the RTU tables.  (Boston Dep. at 53, 64, 67-68.)  Boston explains that he was unable to pull up to the table as closely as he desired.  (Id. at 64, 68.)  He contends that his long arms make it appear that he was closer to the table than he actually was.  (Id. at 68, 72.)  He also points out that the other non-disabled detainees in the footage accessed the table "from the front."  (Id. at 52.)

## Analysis

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing whether there are genuine issues as to any material facts, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010).  The court must not "judge the credibility of the witnesses,

evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

To survive summary judgment, the nonmoving party must make a sufficient evidentiary showing for each essential element of his case on which he bears the burden at trial. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936-37 (7th Cir. 2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (citations omitted). In other words, a genuine issue of material fact exists only if the evidence and inferences drawn therefrom permit a jury to return a verdict for the nonmoving party. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

## A.      ADA and Rehab Act Claims

Sheriff Dart seeks summary judgment on Boston's ADA and Rehab Act claims.[7] The ADA forbids discrimination in the provision of services, programs, and activities by public entities on the basis of an individual's disability. 42 U.S.C. § 12132; *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 209 (1998). In order to establish a violation of Title II of the ADA, Boston must show that: (1) he is a "qualified individual with a disability;" (2) he was denied the "benefits of the services,

---

[7]   The court previously dismissed Boston's ADA and Rehab Act claims against Fuentes in her individual capacity.  (R. 46, Mem. Op. at 4-5.)

programs, or activities of a public entity or otherwise subjected to discrimination by such an entity," and (3) "that the denial or discrimination was by reason of' his disability." *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Love v. Westville Corr. Ctr.,* 103 F.3d 558, 560 (7th Cir. 1996)). There is no dispute here that CCJ is a public entity within the meaning of Title II of the ADA or that Boston is a qualified individual with a disability.

The Rehab Act is co-extensive with the ADA and the analysis under both statutes is the same, except that the Rehab Act includes a requirement that the relevant public entity accepts federal funds. 29 U.S.C. § 794(a); *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). Although Dart does not assert in his brief that the CCJ receives no federal funding, in his opening brief he points out that Boston has submitted no evidence to establish the federal funding element of his Rehab Act claim. (R. 66, Defs.' Mem. at 5.) As a technical matter, Dart is correct that Boston's failure to submit any evidence on this element entitles him to summary judgment on his Rehab Act Claim. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (stating that once moving party points to an absence of evidence on an element of claim, nonmovant must make sufficient evidentiary showing to establish existence of that element). But because Boston—who is proceeding *pro se*—cited cases involving factual findings that CCJ does receive federal funds, *see, e.g., Phipps v. Sheriff of Cook Cnty.*, 681 F. Supp. 2d 899, 913 (N.D. Ill. 2009), and because otherwise the analysis of Boston's ADA and Rehab Act

claims is the same, in the interest of completeness the court will analyze the remaining elements of Boston's Rehab Act claim alongside his ADA claim. *See, e.g., Bramlett v. Dart*, No. 14 CV 5939, 2015 WL 4148711, at *4 n.1 (N.D. Ill. July 9, 2015) (citing evidence submitted in *Phipps* showing that "the Cook County Sheriff's Office has received federal funds since at least 2003").

In order to recover compensatory damages under either the ADA or the Rehab Act, Boston must prove that Dart intentionally discriminated against him in denying him the benefits of a program or activity because of his disability. *See Strominger v. Brock*, 592 Fed. Appx. 508, 511 (7th Cir. 2014). Access to showers and meals is considered a "program or activity" within the meaning of ADA. *See, e.g., Jaros*, 684 F.3d at 672 (holding that inmate access to showers and meals is a program or activity, and reversing dismissal of an ADA/Rehab Act complaint on initial screening); *Phipps*, 681 F. Supp. 2d at 916 (showers constitute "programs and/or services" under the ADA). "Public entities, such as correctional facilities, must 'take reasonable measures to remove architectural and other barriers' that deny access" to such services. *Clemons v. Dart*, No. 13 CV 2356, __ F. Supp. 3d __, 2016 WL 890697, at *4 (N.D. Ill. March 9, 2016) (quoting *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12131(2))). But if a detainee "is housed in a facility that satisfies statutory architectural standards," then correctional officials "have satisfied their obligation to provide reasonable access and cannot be said to have 'denied access' to programs or services." *Id.* (citing 28 C.F.R. § 35.151(c)(1));

*Strominger v. Brock*, No. 10 CV 0158, 2014 WL 268444, at *7 (S.D. Ind. Jan. 23, 2014) (*aff'd,* 592 Fed. Appx. 508 (7th Cir. 2014)) (stating that "compliance with the Uniform Federal Accessibility Standards or with the [ADA] Accessibility Guidelines is sufficient to show compliance with the ADA and Rehabilitation Act").

Boston has failed to demonstrate that a triable issue exists as to whether he was denied the benefits of the services, programs, or activities of a public entity on the basis of his disability. First and most importantly, there is no genuine dispute that the RTU was specifically designed to meet ADA guidelines and to accommodate disabled detainees. Nor is there any dispute that Boston had access to a shower stall and tables that were designed for use by wheelchair-bound detainees. The RTU featured a shower stall that came equipped with a concrete bench, grab bars, and dimensions to ADA specifications. The dayroom tables and chairs were also constructed in accordance with ADA requirements. Dart has submitted evidence showing that the shower stall and tables were constructed in accordance with ADA specifications. Boston has not pointed to evidence to dispute Dart's' evidence that the shower stall and tables met ADA guidelines. Boston's personal dissatisfaction is insufficient to rebut Dart's evidence that the shower stall and tables were designed to meet ADA requirements and nothing in the record suggests that Boston's needs were any different from those of other wheelchair-bound detainees. Boston's assignment to a unit that comported with ADA rules and regulations satisfied Dart's obligation to provide him with reasonable access to showers, meals, and

recreational activities that took place at the RTU tables.  *See Clemons*, 2016 WL 890697, at *4.

Even if the RTU did not comply with statutory structural requirements, Dart is still entitled to summary judgment in his favor because Boston has not established that Dart intentionally discriminated against him because of his disability.  With respect to the appropriate standard for identifying intentional discrimination in Title II cases, it is clear that "mere negligence" does not satisfy the intent requirement.  *See Strominger*, 592 Fed. Appx. at 511-12.  Although the Seventh Circuit has not yet defined the appropriate standard, *see Clemons*, 2016 WL 890697, at *6, there is a consensus in this district that deliberate indifference constitutes intentional discrimination, *see Lacy v. Dart*, No. 14 CV 6259, 2015 WL 7351752, at *3 (N.D. Ill. Nov. 19, 2015).  Here, setting aside that Boston had access to an ADA-compliant shower stall, Fuentes provided Boston with a shower chair, a shower cushion, and shower mats to address his complaints of discomfort.  To the extent he argues that the seven-month delay in providing him with mats demonstrates deliberate indifference, during that delay Fuentes tried accommodating him with a shower chair and a shower cushion.  Boston is not entitled to relief simply because Fuentes was unable to provide immediate solutions when he complained.  *See Vande Zande v. State of Wis. Dep't of Admin.*, 851 F. Supp. 353, 362 (W.D. Wis. 1994) (*aff'd,* 44 F.3d 538 (7th Cir. 1995)) (noting that "some bureaucratic delay is excusable" in providing reasonable accommodations

under the ADA). Again, compensatory damages in ADA and Rehab Act cases are available only if "a public official *intentionally* discriminates because of disability." *Morris v. Kingston,* 368 Fed. Appx. 686, 689-90 (7th Cir. 2010) (emphasis in original). Because Boston has admitted that Fuentes took several proactive measures to find accommodations in response to his complaints, including ordering special bench mats to try to make his showers more comfortable, no reasonable juror could conclude that correctional officials intentionally disregarded his needs.

Moreover, in arguing that Dart violated the ADA despite providing him with ADA-compliant facilities, Boston seems to misapprehend the extent of the jail's duty to accommodate his needs. The ADA does not require Dart to ensure that Boston is free from any and all effects of his paraplegia. The Seventh Circuit has made clear that a reasonable accommodation under the ADA does not mean "the same thing as 'a perfect cure for the problem.'" *Stewart v. Cnty. of Brown,* 86 F.3d 107, 112 (7th Cir. 1996); *Jones v. Sheahan*, No. 97 CV 3471, 1999 WL 1024535, at *3 (N.D. Ill. Nov. 5, 1999) (noting that "the ADA was not designed to address thin mattresses and uncomfortable steel prison beds"). Boston admits that he was able to access the ADA-compliant shower stall, but asserts that he chose not to use the stall because he found the surface of the shower bench uncomfortable. That he chose not to use the shower because he would have preferred a softer bench is insufficient to show that he was intentionally denied access to showers on the basis of his disability. *See Wagoner*, 778 F.3d at 593 (noting that evidence that prisoner was inconvenienced

17

and humiliated by impeded access to facilities was insufficient to establish denial of services under ADA or Rehab Act); *Doyle v. Fairman*, No. 96 C 2572, 1997 WL 610332, at *5 (N.D. Ill. Sept. 29, 1997) (stating that the ADA "does not provide a remedy for inconvenience").

Dart has also shown that he is entitled to summary judgment with respect to Boston's claim regarding the tables in the RTU. Just as Boston's dissatisfaction with the shower stall is insufficient to establish an actionable claim, his preference for a table with empty slots on the sides over the ADA-compliant tables in the RTU is not cognizable under the ADA. First, and most importantly, the record is devoid of evidence that Boston ever advised Fuentes or any other correctional official that the table design did not meet his needs. "[A] plaintiff typically must *request* an accommodation for his disability in order to claim that he was improperly *denied* an accommodation under the ADA." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (citations omitted) (emphasis in original) (employment case). Dart cannot be faulted for failing to accommodate Boston's need for a higher table (or perhaps a blanket or pillow to protect his legs) if Boston never requested any such accommodation.

In any event, security footage of the day room belies Boston's claim that he was denied access to any program or activity that took place at the RTU's tables. (R. 64, DSOF, Ex. 5.) The 12-minute security footage shows that Boston did not experience any difficulty sidling up to the table in his wheelchair, or using the table

to eat or to drink. Although there are no empty slots on the sides of the tables, the head and foot of each table are stool-less. Fuentes has observed Boston use the tables "in the same manner as other detainees housed in the RTU." (Fuentes Decl. ¶ 13.) Boston does not dispute that the footage depicts him accessing the table, but reiterates that his positioning at the table was awkward and explains that he was able to manage only because he has long arms. But those assertions do not render any material fact in dispute. The tables were designed so that detainees in wheelchairs could slide from their wheelchair onto the stool. Boston chose to remain in his wheelchair. And Boston was able to access the table from his wheelchair with no apparent difficulty whatsoever, even if only because he has long arms. That Boston found the tables awkward to use is an insufficient basis from which any reasonable jury could conclude that Dart violated the ADA. *See Wagoner*, 778 F.3d at 593 (affirming summary judgment on paraplegic inmate's ADA claim despite humiliation he encountered in having to crawl from van that did not accommodate wheelchair). And surely there can be no actionable ADA claim stemming from having to sit at the end versus the side of a table. *See id.* For all of these reasons, Dart is entitled to summary judgment on Boston's ADA and Rehab Act claims.

**B.    Section 1983**

Even when the record is viewed in the light most favorable to Boston, no reasonable trier of fact could find that Fuentes acted with deliberate indifference to

19

his disability in violation of Section 1983. "The Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees." *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014) (internal quotation and citation omitted). Under that provision courts essentially apply "the same deliberate indifference analysis to detainees as the Eighth Amendment does to inmates." *Id.* Boston could prevail on his claim that Defendants violated his constitutional rights by showing that correctional officials deprived him of "the minimal civilized measure of life's necessities," subjected him to "the wanton infliction of pain," *see Jaros*, 684 F.3d at 670-71 (internal quotation and citation omitted), or acted with deliberate indifference to his serious medical needs, *see, e.g., Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Pittman*, 746 F.3d at 775. Medical deliberate indifference claims have an objective and a subjective element: the detainee must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard his medical need. *Pittman*, 746 F.3d at 775-76. "This subjective standard requires more than negligence and it approaches intentional wrongdoing," comparable to criminal recklessness. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *see also Morris*, 368 Fed. Appx. at 689 ("Mere negligence—even gross negligence—does not violate the Constitution.").

Boston appears to argue that he had a serious medical need in the form of pressure sores that became infected and needed to be treated with antibiotics. In

other words, he argues that Defendants either failed to prevent or caused the pressure sores by providing an uncomfortable concrete bench in the ADA-compliant shower. As Defendants point out, there is no medical evidence in the record to substantiate Boston's assertion that the few minutes he spent in the ADA-compliant shower caused his pressure sores or that scrapes he received while using the concrete bench evolved into pressure sores. But even overlooking that lack of evidence, Defendants persuasively argue that Boston cannot establish that they acted with deliberate indifference to his needs. A similar case, *Strominger v. Brock*, 592 Fed. Appx. 508 (7th Cir. 2014), is instructive here. In *Strominger*, an inmate who used a wheelchair brought a Section 1983 action claiming that jail officials and a doctor failed to provide him with a cell and shower that complied with federal accessibility standards. 592 Fed. Appx. at 510. The plaintiff contended that his cell offered little room for movement and that it was difficult to transfer onto the toilet and to his bed. *Id.* He also maintained that the showers were logistically unsafe for him. *Id.* The plaintiff asserted claims under the Civil Rights Act, ADA, and the Rehab Act. *Id.* On appeal the Seventh Circuit affirmed the trial court's entry of summary judgment in favor of the defendants on all claims. *Id.* at 512. As to the plaintiff's complaint about the non-ADA-compliant cell, the Seventh Circuit observed that although his cell conditions made his mobility and toilet access more difficult on a temporary basis, that was insufficient to show that the plaintiff "was deprived of life's necessities" as required for his Eighth Amendment claim. *Id.* at

511. As to the plaintiff's complaint about the unsafe portable shower chair, the Seventh Circuit rejected this claim as well and noted that he was free to wash himself using the sink in his cell during the 133 days he claimed to have been unable to shower. *Id.* at 510-11. The court distinguished "a denial of life's minimal necessities" from "receiv[ing] the level of accommodation that [the plaintiff] wished." *Id.* at 511. Furthermore, the defendants had responded to the plaintiff's complaints about the showers by "discussing the issue with him, investigating possible solutions, and eventually installing wall-mounted shower chairs." *Id.* The Seventh Circuit accordingly concluded that the defendants were guilty, at most, of negligence in transferring the plaintiff from an ADA-compliant cell to one he argued was unequipped to meet his needs. *Id.* at 510-11. That was insufficient to establish an Eighth Amendment violation. *Id.* at 511.

The facts in this case are similar to the facts in *Strominger*. Like the defendants in *Strominger*, Fuentes met with Boston and explored options to address his complaints. Fuentes first secured a shower chair for Boston, which he rejected. Fuentes next provided Boston with a shower cushion, which he likewise vetoed. Fuentes then obtained two shower mats for Boston, but he found fault with these as well. It is unclear whether any sort of shower accommodation would have satisfied Boston, but it is clear that Fuentes made considerable effort to provide for Boston's needs. And with regard to table height, there is no evidence that Boston ever complained that the ADA-compliant tables did not suit him. Even accepting his

statements regarding his limited access to the ADA-complaint shower stalls and tables, Boston cannot show that those limits amounted to a deprivation of life's necessities. *See Strominger*, 592 Fed. Appx. at 511; *Jaros*, 684 F.3d at 671. The record simply does not—even when every inference is drawn in Boston's favor—support a conclusion that Fuentes acted with deliberate indifference to his accommodation or medical needs.

Because Boston's underlying constitutional claim against Fuentes fails, the court must likewise grant summary judgment in favor of Sheriff Dart, who Boston sued in his official capacity. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam) (if defendant police officers "inflicted no constitutional injury," then the municipality could not be liable for damages); *McBroom v. Payne*, 478 F. Appx. 196, 201 (5th Cir. 2012) ("We do not reach the merits of the district court's summary judgment disposing of McBroom's official-capacity suit against [Sheriff] Payne, because the jury's verdict for [Deputy] Massengill leaves no underlying constitutional violation on which to base municipal liability.") (citation omitted); *Waybright v. Frederick Cnty.,* 528 F.3d 199, 203 (4th Cir. 2008) ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate constitutional injury at the hands of the individual officer. . . .") (internal punctuation and citations omitted). Boston has no triable claim against either Defendant under 42 U.S.C. § 1983.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**

### Notice of Appeal Rights

If Boston wishes to appeal, he must file a notice of appeal with this court within 30 days of the entry of final judgment. *See* Fed. R. App. P. 4(a)(1). If Boston appeals, he will be liable for the $505 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the Seventh Circuit finds the appeal to be non-meritorious, Boston could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he or she is in imminent danger of serious physical injury. *Id.* If Boston seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this court. *See* Fed. R. App. P. 24(a)(1).

Boston need not bring a motion to reconsider this court's ruling to preserve his appellate rights. However, if Boston wishes the court to reconsider its

judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of final judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), the motion must be filed no more than one year after the entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).